Affirmed
and Memorandum Opinion filed September 17, 2009.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-08-00771-CR

____________

 

MATTHEW FREEMAN, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 248th
District Court

Harris County, Texas

Trial Court Cause No. 1175064

 



 

M E M O R A N D U M  O P I N I O N

A jury convicted appellant Matthew Freeman
of aggravated robbery[1]
and sentenced him to eighteen years= incarceration in
the Texas Department of Criminal Justice, Institutional Division.  In a single
issue, Freeman asserts that he was denied the effective assistance of counsel
because his trial counsel waived appellate review of the trial court=s ruling on his
motion to suppress his video-recorded interview.  We affirm.








I

On the morning of November 6, 2007,
seventy-nine-year-old Clay Chevalier was beaten and left beside the road when
he went out for a walk in his Houston neighborhood.  No one witnessed the
assault, but two passers-by found Clay and called 911.  Paramedics responded to
the scene and transported him by ambulance to the hospital.  Clay was
incoherent and could provide no information about the assault, and he died from
his injuries four days later.  After his death, his family members contacted
the Houston Police Department (AHPD@) to report the
crime.  Sergeant Christopher Cegeilski in HPD=s homicide
division was assigned to investigate the case. 

Meanwhile, on November 11, Freeman, his
step-brother, and Zkeus Carrington visited the Chevaliers= home and denied
being involved in the crime.  One of the Chevalier family members called the
police; HPD officers arrived and subsequently transported Freeman and Zkeus to
the police station. Sergeant Cegeilski interviewed Freeman at the police
station.  In the video-recorded interview, Freeman inculpated himself.  Before
trial, Freeman moved to suppress the interview, alleging that it stemmed from
an illegal arrest. 

At the motion-to-suppress hearing held the
day before Freeman=s jury trial began, Clay=s son, Reginald
Chevalier, testified that he had heard rumors that Freeman had been involved in
the crime against his father.  According to Reginald, Freeman, his
step-brother, and Zkeus came to his father=s house on
November 11 to Aclear@ their names. 
Reginald heard Zkeus and Freeman bickering about who had robbed his father. 
Stephon Chevalier, another of Clay=s sons, also
testified that he had heard rumors about Freeman=s involvement in
the crime.  He explained that he had spoken with Ann Hogan, who told him Zkeus
said he was there when Freeman hit and robbed Stephon=s father.  When
Stephon heard from his sister Carolyn that Freeman and Zkeus had shown up at
his father=s house, he called the police.








HPD officer L.D. Brooks testified that
dispatch notified her that suspects were at a scene and wanted to talk to the
police; she was dispatched to the Chevaliers= home.  When she
arrived, she saw Freeman and Zkeus, as well as several family members.  She
detained Freeman and Zkeus for Aofficer safety,@ searched their
pockets and put them in her patrol car to await the arrival of a supervisor to
speak with them.  She explained that she was not arresting Freeman and Zkeus when
she put them in the back of her patrol car, but was detaining them because they
were murder suspects.  She testified that she arrived at the scene alone and
observed arguing and confusion between Freeman=s family and the
Chevaliers.  According to Officer Brooks, she did not have a warrant to arrest
Freeman, but Freeman said he wanted to talk to the police because he Adidn=t do it.@  She stated that
Freeman went into the station house voluntarily, although he was in handcuffs
and Adetained.@








HPD officer Mario Clinton also testified
at the hearing.  Officer Clinton had been involved in the initial investigation
into Clay=s death.  He explained that he recognized the
Chevaliers= address when the dispatch call went out over the
radio, and found Zkeus=s and Freeman=s presence at the
victim=s home to be Asuspicious.@  He drove to the
Chevalier home in response to the dispatch call; when he arrived, Freeman was Adetained@ in handcuffs in
the back of Officer Brooks=s patrol car.  According to Officer
Clinton, he then spoke to Zkeus=s mother, Rhonda Carrington, who was also
at the Chevalier home.  She told him that Zkeus had informed her that he and
Freeman were walking down the street when Freeman hit an Aold man@ who fell down. 
Zkeus told her that Freeman went through the old man=s pockets after he
fell. Officer Clinton testified that he reported this information to
investigators in the HPD homicide division; a sergeant in the homicide division
told him to place both Freeman and Zkeus on Ainvestigative hold@ and transport
them to central jail.  On cross-examination, Officer Clinton further stated
that members of the Chevalier family had heard that Freeman was Abragging@ about committing
the crime.  He additionally stated that officers spoke with Ann Hogan at the
scene, who corroborated what Rhonda Carrington had told him earlier about
Zkeus.  

Sergeant Cegeilski testified that as part
of his investigation, he had spoken with several people who had heard about the
crime.  Freeman=s name Akept coming up@ in these
conversations.  Sergeant Cegeilski interviewed Tavarius Washington, who told
him that Zkeus and Freeman had gone out the morning of the offense to collect
money from someone named ABlack.@  They asked
Washington to go with them, but he declined.  After Sergeant Cegeilski
interviewed Washington, he and his partner were dispatched to another murder
scene.  While he was at the other scene, Cegeilski=s supervisor
called him and told him that Freeman and Zkeus were at the Chevaliers= home claiming
that they were not involved in the crime.  Sergeant Cegeilski explained that Ann
Hogan had come into the station and given a sworn statement regarding Zkeus=s and Freeman=s involvement in
the offense.  When he was notified that officers had Adetained@ Freeman and
Zkeus, he testified that he did not want to have them arrested at that point
because he wanted to give them a chance to explain.  He asked the officers at
the scene to transport them to the station so he could interview them. 
Sergeant Cegeilski stated that Freeman was in police custody for about twelve
hours before he interviewed him.  After he interviewed Zkeus and Freeman,
Sergeant Cegeilski arrested Freeman.

Finally, Freeman testified at the
motion-to-suppress hearing.  He explained that he went to the Chevaliers= home to tell them
he had not been involved in the beating and robbery of Clay.  According to
Freeman, he did not want to speak to police officers.  He stated that Officer
Brooks ordered him and Zkeus to lie down on the ground, then she handcuffed and
searched them before putting them in the back of her patrol car.  He testified
that he believed he was under arrest at that point.  








After hearing the evidence, the trial
court denied Freeman=s motion to suppress.  The trial court
concluded that officers had probable cause to arrest Freeman before
transporting him to the station.  Specifically, the trial court determined
that, at first, Freeman was simply being detained at the scene because the
officers were considering releasing him.  But the trial court concluded that
before Freeman was transported to the station, the officers had probable cause
to arrest him.  Because the officers had probable cause to arrest Freeman, the
court determined that his interview did not stem from an illegal arrest and was
admissible. 

When the State later offered Freeman=s recorded
interview at trial, his trial counsel stated that he had Ano objection@ to its
admission.  In addition to numerous other witnesses who testified during the
guilt-innocence phase of his trial, Freeman also took the stand.  He admitted
that he and Zkeus went out the morning that Clay was attacked to collect money
that a Acrackhead@ owed Zkeus. 
Freeman claimed that he was afraid of Zkeus because Zkeus was a violent
person.  He testified that they were unable to collect the money from the
person who owed it to Zkeus, so Zkeus was upset.  Freeman stated that he
suggested that they rob someone Ato see what
[Zkeus] was going to do,@ but he claimed he did not mean it.  He
also admitted that he pushed Clay from behind, with an open hand to his head. 
On cross-examination, Freeman testified that he hit Clay because he did not
want Zkeus to think he was a Apunk.@  He also stated
that, after Clay had fallen to the ground, he told Zkeus to check his pockets
to see if he had any money.

The jury found Freeman guilty and
sentenced him to eighteen years= incarceration in the Institutional
Division of the Texas Department of Criminal Justice.  The trial court entered
the sentence in accord with the jury=s verdict.  No
motion for new trial was filed, and this appeal timely followed.

II

In a single issue, Freeman contends that
his trial counsel rendered ineffective assistance because he waived any
appellate challenge to the trial court=s denial of his
motion to suppress his confession.








A

In reviewing claims of ineffective
assistance of counsel, we apply a two‑prong test. See Salinas v. State,
163 S.W.3d 734, 740 (Tex. Crim. App. 2005) (citing Strickland v. Washington,
466 U.S. 668, 687 (1984)).  To establish ineffective assistance, an appellant
must prove by a preponderance of the evidence that (1) his trial counsel=s representation
fell below the standard of prevailing professional norms, and (2) there is a
reasonable probability that, but for counsel=s deficiency, the
result of the trial would have been different.  Strickland, 466 U.S. at
687. 

An accused is entitled to reasonably
effective assistance of counsel.  Id. at 686; King v. State, 649
S.W.2d 42, 44 (Tex. Crim. App. 1983).  When evaluating a claim of ineffective
assistance, the appellate court looks to the totality of the representation and
the particular circumstances of each case.  Thompson v. State, 9 S.W.3d
808, 813 (Tex. Crim. App. 1999).  There is a strong presumption that counsel=s conduct fell within
a wide range of reasonable representation.  Salinas, 163 S.W.3d at 740. 
To overcome the presumption of reasonable professional assistance, A[a]ny allegation
of ineffectiveness must be firmly founded in the record, and the record must
affirmatively demonstrate the alleged ineffectiveness.@ Thompson,
9 S.W.3d at 814.  When determining the validity of an ineffective‑assistance
claim, any judicial review must be highly deferential to trial counsel and
avoid the distorting effects of hindsight.  Ingham v. State, 679 S.W.2d
503, 509 (Tex. Crim. App. 1984) (citing Strickland, 466 U.S. at 689). 
Moreover, when the record is silent as to trial counsel=s strategy, we
will not conclude that defense counsel=s assistance was
ineffective unless the challenged conduct was A>so outrageous that
no competent attorney would have engaged in it.=@ Goodspeed v.
State, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (quoting Garcia v.
State, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)). 








If a criminal defendant can prove that
trial counsel=s performance was deficient, he must still
affirmatively prove that counsel=s actions
prejudiced him.  Thompson, 9 S.W.3d at 812.  To demonstrate prejudice, a
defendant must establish a reasonable probability that the result of the
proceeding would have been different if trial counsel had acted professionally.
Id. A reasonable probability is a probability sufficient to undermine
confidence in the outcome.  Mallett v. State, 65 S.W.3d 59, 63 (Tex.
Crim. App. 2001).

B

Here, Freeman asserts that his trial
counsel committed a professional error when he waived the motion to suppress by
affirmatively stating Ano objection@ when his
statement was offered at trial.  See Brown v. State, 183 S.W.3d 728, 741
(Tex. App.CHouston [1st Dist.] 2005, pet. ref=d) (citing Moraguez
v. State, 701 S.W.2d 902, 904 (Tex. Crim. App. 1986) (en banc)) (explaining
that affirmative assertion of Ano objection@ when evidence
subject to pretrial motion to suppress is offered waives any error in the
admission of the evidence despite the pretrial ruling).  He argues that there Ais no scenario under
which the actions of counsel waiving a good motion to suppress an incriminating
statement could be considered >sound trial strategy.=@  We disagree for
several reasons.








First, Freeman has not demonstrated that
the trial court erred in denying his motion to suppress.  Freeman focuses his argument on the
impropriety of the Ainvestigative detention@ and argues that he was illegally
arrested. As discussed supra, however, the trial court determined that,
although Freeman was initially being detained at the Chevaliers= home, officers had probable cause to
arrest him prior to transporting him to the station.  An officer may make a
warrantless arrest if he discovers a person in a suspicious place and under
circumstances that reasonably show the individual has committed a felony.  Tex.
Code Crim. Proc. Ann. art. 14.03(a)(1) (Vernon Supp. 2008).  A>Probable cause= for a warrantless arrest exists if,
at the moment the arrest is made, the facts and circumstances within the
arresting officer=s knowledge and of which he has reasonably trustworthy
information are sufficient to warrant a prudent man in believing that the
person arrested had committed or was committing an offense[,]@ regardless of the subjective beliefs
of the arresting officer.  Amador v. State, 275 S.W.3d 872, 878 (Tex.
Crim. App. 2009) (citing Beck v. Ohio, 379 U.S. 89, 91, 97 (1964)).   

At the time that Freeman was Aarrested,@ i.e., when Officer Clinton
transported him to the station, Zkeus=s mother had informed Officer Clinton
that Zkeus had admitted he was present when Freeman beat and robbed Clay. 
Further, Ann Hogan had corroborated the information that Zkeus=s mother had passed along to Officer
Clinton.  As noted above, Officer Clinton also testified that he found the
circumstances of Zkeus and Freeman going to the victim=s house Asuspicious,@ and that members of the Chevalier
family had told him Freeman was heard Abragging@ about committing the crime against
Clay.  Given this information, Officer Clinton had sufficient information from
which he could have reasonably believed that Freeman had committed a felony.  See
Tex. Code Crim. Proc. Ann. art. 14.03(a)(1).  Thus, Officer Clinton had
probable cause to arrest Freeman when he transported him to the city jail.  See
Hinojosa v. State, 4 S.W.3d 240, 248 (Tex. Crim. App. 1999) (citing
Franks v. Delaware, 438 U.S.154, 165 (1978) for the proposition that
probable cause may be founded on hearsay).  The trial court did not err in
denying Freeman=s motion to suppress; thus, failure to preserve the motion to
suppress cannot support an ineffectiveness claim.  Cf. Thacker v. State,
999 S.W.2d 56, 67 (Tex. App.CHouston [14th Dist.] 1999, pet. ref=d) (ATrial counsel is not ineffective for
failure to make meritless objections.@).

Second, because the trial court denied his
motion to suppress, Freeman=s trial counsel could have chosen to
refrain from objecting to the admission of his statement to avoid having jurors
believe that Freeman was attempting to hide something from them. Indeed,
Freeman=s trial strategy
was to admit being present when Clay was attacked, but to cast blame on Zkeus
and emphasize that Freeman did not intend to commit theft.  This strategy is
apparent from the following portions of his trial counsel=s opening
argument:








Well, Zkeus stopped to talk to Mr.
Chevalier and [Freeman], knowing Mr. Chevalier, came over.  And at that time
Zkeus began motioning to [Freeman] and [Freeman], in the mind of an 18-year-old,
felt the pressure not to look like a punk.  So he pushed the older gentleman
and at that point Zkeus Carrington, who was a very big person and a strong
person, hit Mr. Chevalier on the side of the head and he ended up cracking or
having a skull fracture from that blow. 

. . . 

And you=re going to hear [his] statement. 
You=re going to see that statement as a
video confession and you=ll see that he wasn=t forthright at the beginning of
the statement.  He gave a story and it changed and it changed the whole time. 
He=s going to testify and he=s going to be able to clarify these
things. . . . [H]e=ll be able to discuss what he said on the video confession
and after looking at that evidence and hearing the evidence, there will be no
evidence that [Freeman] intended to steal or commit theft against Clay
Chevalier. 

Although his trial counsel=s strategy
apparently did not work in Freeman=s favor, we cannot
say the challenged conduct was A>so outrageous that
no competent attorney would have engaged in it.=@ Goodspeed,
187 S.W.3d at 392. 

Finally, Freeman chose to testify at his
trial.  As discussed above, he admitted that (a) he suggested to Zkeus that
they rob someone, (b) he hit Clay himself, and (c) he told Zkeues to check Clay=s pockets to see
if he had any money.  In light of this inculpating testimony, we cannot say
there is a reasonable probability that the result of the proceeding would have
been different.  Thompson, 9 S.W.3d at 814.  

Under these circumstances, we cannot say
that Freeman=s trial counsel was ineffective, and we overrule
Freeman=s first issue.

 

 

 

 

 








* * *

Freeman has not established either that
his trial counsel was ineffective or that the result of the proceeding would
have been different had his trial counsel acted professionally.  We thus
overrule his only issue and affirm the trial court=s judgment.

 

 

 

 

/s/      Jeffrey
V. Brown

Justice

 

 

 

Panel consists of Justices Seymore, Brown, and Sullivan.

Do Not Publish C Tex. R. App. P. 47.2(b).









[1]  A grand jury originally indicted appellant with
felony murder in this case, but the State later dismissed that charge.